**Dollean G. POWELL, Petitioner,**

v.

**DISTRICT OF COLUMBIA HOUSING AUTHORITY, Respondent.**

No. 96–AA–1347.

District of Columbia Court of Appeals.

Argued March 21, 2001.
Decided March 13, 2003.

Phillip C. Zane, Washington, DC, for petitioner.

Charniele L. Herring, with whom Natalie O. Ludaway and Rebecca L. Taylor, Washington, DC, were on the brief, for respondent.

Before STEADMAN, SCHWELB and RUIZ, Associate Judges.

RUIZ, Associate Judge:

Dollean Powell appeals the decision of the District of Columbia Housing Authority (DCHA) to terminate her eligibility for housing subsidies under the Tenant Assis-

tance Program (TAP) for "fraudulently" under-reporting her income in order to obtain more assistance. *See* 14 DCMR § 1936.1(c) (1991). Powell contends that DCHA ended her assistance despite having failed to establish all of the elements of fraud, and that its factual findings were not supported by substantial evidence. We concur with Powell that DCHA's findings of fact were insufficient, and reverse and remand this matter for further proceedings.

## FACTS

Powell began to participate in the TAP program in 1987. In 1992 she was reevaluated for continued eligibility in the program. The re-application form includes three questions pertinent to this appeal: (1) "Does any member of your family now receive or expect to receive child support?" (2) "Is any member of your household entitled to child support that he/she is not now receiving?" and (3) "What is your monthly income, separated by the type of income that your household receives?"

In the responses she submitted in January of 1992, Powell stated on the form that she did not expect to receive any child support payments. She had not, in fact, received any such payments in 1991, despite a court order directing her ex-husband to pay child support for the daughter, Tia Monique Powell.[1] And she answered "yes" to the inquiry whether a member of her household was entitled to child support payments that were not, however, being received.

At the time of the second annual review of her TAP benefits in September of 1993, Powell had received child support pay-

ments for two months—the first in two years—and would continue to do so for the remainder of 1993, receiving a total of $1,850 that year. In the form, she removed her daughter's name from the list of household members,[2] and again stated that members of her household were entitled to child support, but that none was received or expected. She did not include the child support payments she had received that year as part of her household income. Powell mistakenly listed as income more assistance then she was in fact receiving from DHS, which resulted in a reduction of her rent subsidy under TAP from $812 to $588 per month.

Powell continued to receive child support payments throughout 1994 totaling $3,567. In November of that year, when she again completed a TAP form, she did not list any of those payments as household income—although she did state not only that there was an entitlement to child support in her household but also that she expected to receive such payments.

In early August of 1995, during a conversation with a caseworker with the Department of Human Services, Powell was informed that her AFDC[3] benefits would be reduced for failure to report her child support income. Later that month, Powell reported to the TAP offices for her annual reexamination and for the first time disclosed that she received $264 per month in child support. When Powell told the caseworker that she had received child support payments during prior years, she was asked to obtain a record of all child support payments. She complied and provided records showing that she had received

---

1. Apparently her ex-husband had made some payments between 1988 and 1990.

2. Tia Monique Powell was murdered in August 1992 as she was about to begin classes as a freshman in college. Her death left her young daughter in the care of Powell, her grandmother.

3. Aid to Families with Dependent Children.

about $14,000 in child support payments between 1988 and 1995, which had not been reported to the TAP program. The caseworker who interviewed Powell wrote at the time that Powell had informed, "that she had been receiving child support for one of her children for years and was now going to be penalized, because she was also receiving AFDC."

As a result of this under-reporting, DCHA terminated Powell's eligibility from the TAP program effective November 30, 1995. When told that her benefits would end, Powell requested an "official review" pursuant to 14 DCMR §§ 1936.3 and 1710 (1991). Although the review was initially scheduled to take place before termination of benefits took effect, Powell requested an extension to obtain counsel, and the review ultimately took place well after her housing subsidies had been terminated. At a hearing, both Powell and DCHA presented evidence through documents and direct testimony, and each cross-examined adverse witnesses. Powell testified that in 1992 she had understood from the TAP representative that child support payments need not be included as income because they were owed for the support of the child. She said that when she had raised with the caseworker in 1993 that she had begun to receive child support payments she had again been told that because the child support was owed to her daughter, she need not list it as household income. According to the testimony of the caseworker, in 1995 Powell offered the information about child support and did not attempt to hide it.

The administrative reviewer, after summarizing the evidence presented by Powell and the agency's caseworker, affirmed DCHA's initial decision terminating Powell's TAP benefits:

Based upon the evidence presented, the law, and the oral presentation of the parties, the Reviewer will uphold the termination decision of the Tenant Assistance Program (TAP) for 11/30/95, of Ms. Dollean Powell.

After the review of the tape recording of the administrative review procedures, it is concluded that Ms. Powell decided to use the child support payments in 1995 as a means of having to paid [sic] less rent through the TAP program, which she noted for the record.

The reviewer will maintain and agree with the termination decision of this case.

Powell's termination was for fraud. Tenants who have been terminated for fraud may never again receive assistance, *see* 14 DCMR § 1932.3(c) (1991), while those who make ordinary mistakes need only repay any overpayments. *See* 14 DCMR § 1936.4 (1991).

## ANALYSIS

### A. Jurisdiction[4]

■ We begin with an analysis of whether we have jurisdiction to consider a petition to review the "administrative review" afforded Powell by DCHA. *See* 14 DCMR § 1936.3 (1991).

■ Our jurisdiction to hear a petition to review a decision by an administrative agency is limited to "contested cases." *See* D.C.Code § 1–1510 (1999 Repl.); *see also* D.C.Code § 11–722 (1995 Repl.) (defining the jurisdiction of the court of appeals over administrative agencies). A "contested case" is a controversy involving a "trial-type" hearing that is required either by statute or by constitutional right,

---

4. After oral argument, we *sua sponte* issued an order requesting that the parties file sup-

plemental briefing on the issue of the court's jurisdiction.

see *Rones v. District of Columbia Dep't of Hous. & Community Dev.*, 500 A.2d 998, 1000 (D.C.1985) (citation omitted), and which is an adjudicative, as opposed to a legislative, determination. *See Donnelly Assoc. v. District of Columbia Historic Preservation Review Bd.*, 520 A.2d 270, 276 (D.C.1987). Because it is evident that Powell's termination from TAP is an adjudicative determination, *see id.* at 278 (defining an adjudication as a "decision directed at the rights of specific individuals"), whether we have jurisdiction depends solely on whether DCHA's decision was made in a "trial-type" hearing required by statute or the Constitution.

Turning first to the statute authorizing TAP and the regulations implementing it, *see J.C. & Assocs. v. District of Columbia Bd. of Appeals & Review*, 778 A.2d 296, 304 (D.C.2001) (holding that a right to a trial-type adjudication may arise under either statute or regulation), we find no requirement for a trial-type hearing—and therefore no basis for our jurisdiction. The statute authorizing TAP is silent on due process protections. *See* D.C.Code § 45–2537 (2000 Supp.) (authorizing administrative appeal).[5] Regulations govern-

ing TAP "provide the tenant an opportunity for [an] administrative review of the action as described in," *see* 14 DCMR § 1936.3 (1991),[6] but do not require substantive due process protections such as representation by counsel, cross-examination of adverse witnesses, fact-finding by an impartial adjudicator, or any of the other accoutrements of a trial-type hearing.[7] The "administrative review," also referred to as an "official review," *see* 14 DCMR § 1710.1, or a "review meeting," *see* 14 DCMR § 1710.3, requires the official involved in the original decision and that person's supervisor, *see* 14 DCMR § 1710.3, to meet with the person requesting the review and reconsider the decision in light of any applicable information. *See* 14 DCMR § 1710.4. There are no formal processes required during the review meeting or in rendering the decision, other than that the DCHA staff participating in that meeting notify the claimant of the "final decision" within seven days of the review meeting, *see* 14 DCMR § 1710.5, which "shall be the final administrative recourse on all matters of Tenant Assistance Program administration," *see* 14 DCMR § 1710.6.[8]

**5.** D.C.Code § 45–2537(b) provides:

If, at any time, the Department determines that a tenant receiving tenant assistance is not, or has ceased to be, eligible for tenant assistance, the Department shall notify the tenant and housing provider in writing, setting forth the reasons for the determination. Tenant assistance payments shall terminate on the next day the rent is due occurring at least 30 days after the date the notice is given, unless, within 15 days after the receipt of the notice, the tenant submits to the Department a written statement, under oath or affirmation, including any available supporting documents, asserting the tenant's reasons for alleging continued eligibility. Within 30 days following the receipt of the statement and documents, the Department shall make the final determination of the tenant's eligibility for continued receipt of tenant assistance.

**6.** 14 DCMR § 1936.3 provides:

DPAH shall terminate assistance because of tenant fraud with a thirty (30) calendar day written notice which shall provide the tenant an opportunity for administrative review of the action as described in § 1710 of this subtitle.

**7.** That Powell was in fact represented by counsel, presented evidence, and cross-examined adverse witnesses is irrelevant to the question of whether Powell was legally entitled to such protections. *See Communication Workers of Am. v. District of Columbia Taxicab Comm'n Panel on Rates & Rules*, 542 A.2d 1221, 1223 (D.C.1988).

**8.** 14 DCMR § 1710 provides in full:

1710.1 Applicants, participants, and housing providers may request an official review

■ If we have jurisdiction, therefore, it must be based on constitutional requirements. It is uncontested that Powell, as a recipient of a rental subsidy, has a constitutional right to due process before benefits may be terminated. *Cf. Aikens v. District of Columbia Dep't of Hous. & Community Dev.*, 515 A.2d 712, 718 (D.C. 1986) (holding that participants in federally funded housing assistance have due process rights in the termination of benefits). Due process, however, "is flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (citation omitted). The question is whether the protections required here rise to the level of a trial-type adjudication that is a "contested case."

The Supreme Court held in *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), that "a hearing closely approximating a judicial trial" was constitutionally required before the government suspended welfare benefits. *Mathews*, 424 U.S. at 333, 96 S.Ct. 893 (characterizing the holding of *Goldberg*). The *Goldberg* Court held that the administrative agency must provide "timely and adequate notice detailing the reasons for the proposed termination;" "an effective opportunity [for the recipient] to defend by confronting any adverse witnesses and by presenting his own arguments and evidence orally;" the opportunity for the appellant to retain counsel; an "impartial" decision maker; a decision resting "solely on the legal rules and evidence adduced at the hearing;" and a statement of reasons for the decision and the evidence relied upon. *Id.* at 325 n. 4, 96 S.Ct. 893 (summarizing *Goldberg*, 397 U.S. at 266–71, 90 S.Ct. 1011).

■ To decide whether similar protections are merited before TAP benefits may be terminated, we consider three factors: (1) the nature of the private interest to be affected by official action; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) the administrative and fiscal burdens of a substitute procedure. *Id.* at 335, 96 S.Ct. 893.

Our examination of the first factor—the nature of the private interest affected—indicates that permanent disbarment from TAP requires similar due process protections as the temporary cessation of welfare benefits in *Goldberg*, where the Court emphasized that the property interest of the welfare beneficiary is heightened by its importance to obtaining essential food, clothing, housing, and medical care. *See* 397 U.S. at 264, 90 S.Ct. 1011. TAP subsidies, like welfare payments, are designed to assist lower income families in obtaining the necessities of life. *See* D.C.Code § 45–2532 (1996 Repl.) (stating that the purpose

of any DPAH action which affects eligibility, termination from the program, or level of assistance.

1710.2 A request for an official review shall be made directly with DPAH staff person involved in the original decision being reviewed. The request shall be made in writing.

1720.3 The DPAH staff person shall schedule the review meeting with the party requesting the review and the DPAH staff person's supervisor within seven (7) calendar days of the request.

1710.4 At the review meeting the parties shall reconsider the decision, the information originally used in making the decision, and any other applicable information.

1710.5 Within seven (7) calendar days of the review meeting, DPAH shall, in writing, notify the party requesting the review of its final decision.

1710.6 The review meeting shall be the final administrative recourse on all matters of Tenant Assistance Program administration.

of TAP is to "aid[ ] lower-income families in obtaining a decent place to live"); *see also Aguiar v. Hawaii Hous. Auth.*, 55 Haw. 478, 522 P.2d 1255, 1268 (1974) (holding that "public housing is a variety of welfare subsidy the termination ... of which may jeopardize the economic survival of its recipients"); *cf. Mathews*, 424 U.S. at 340–41, 96 S.Ct. 893 (commenting that recipients of income-based public assistance have a stronger due process interest in the continuation of benefits than recipients of other subsidies, such as disability payments). But unlike the temporary suspension of welfare benefits faced by the appellant in *Goldberg*, Powell has been permanently terminated from eligibility for housing benefits under TAP without regard to future need. *See* 14 DCMR § 1932.3. The similarity of the property interests involved here and in *Goldberg*, coupled with the permanent deprivation of TAP assistance, indicates that the property interest before us is a strong one demanding protection.

█ DCHA counters that, assuming Powell had a property interest that entitled her to a trial-type hearing before her eligibility was terminated, she does not have a similar right to a post-termination hearing. Although Powell's administrative review had been initially scheduled to take place before her benefits ended, she requested a delay to seek counsel. According to DCHA, by this request she forfeited her due process rights based on an existing property interest, and she was in the position of a mere applicant at the time the hearing actually took place, *citing Rones*, 500 A.2d at 998. We disagree that the reasoning in *Rones* applies here. The loan applicant in *Rones* had no property interest because she had never received assistance in the past. *See id.* at 1001 n. 4. The same is not true for Powell. Moreover, it is illogical to argue that a person relinquishes a property interest by seeking the assistance of counsel to protect it.

█ The second factor—the risk of an erroneous deprivation of a property interest—counsels in favor of *Goldberg* protections as well, at least in matters which present complex factual and legal questions. Powell is accused, in essence, of common law fraud.[9] One of the elements of fraud is that the tortfeasor actually know that the misrepresentations are false, a subjective inquiry requiring the fact-finder to assess the state of mind of the person charged with fraud. *See Jacobs v. District Unemployment Compensation Bd.*, 382 A.2d 282, 287 (D.C.1978). This is a fact-based inquiry based on documentation, determinations of witness credibility and inferences. *Mathews* explained that trial-type adjudications may be required where "a wide variety of information may be deemed relevant, and issues of witness credibility and veracity ... are critical to the decision making process," 424 U.S. at 343–44, 96 S.Ct. 893, but not for "more sharply focused and easily documented decision[s]." *Id.* Because termination of TAP eligibility for fraud can involve the evaluation of a wide array of information and witness credibility, it requires procedural protections to prevent error in adjudication.

9. We concur with the parties that the use of the term "fraud" in the context of 14 DCMR § 1936.1 (which requires permanent termination of assistance for "fraudulent" underreporting of income) and 14 DCMR 1936.4 (which merely requires repayment for misstatements not involving fraud), indicates that proof of "fraudulent" underreporting of income requires the same elements of proof as common law fraud. *Cf. Jacobs v. District Unemployment Compensation Bd.*, 382 A.2d 282, 286 (D.C.1978) (holding that the use of the word "fraud" in a statute incorporates the elements of common law fraud).

The fiscal and administrative burden of a trial-type adjudication, the third factor we consider, will be minimal. As is evident from this case, DCHA already allows for representation by counsel, presentation of evidence, cross-examination of adverse witnesses, and findings of fact. *See Branch v. District of Columbia Dep't of Pub. & Assisted Hous.*, 661 A.2d 1102, 1104 (D.C.1995) (commenting that DCHA provides "an independent trial-type review by a hearing examiner" when terminating TAP benefits). Continuing to provide such protections will impose little or no additional cost on DCHA.

We thus hold that, because of the importance of permanent ineligibility for rental subsidies to the subsistence of TAP participants, the fact-based nature of a fraud determination, and the minimal impact of imposing due process protections on the public purse, a trial-type hearing is constitutionally compelled. *Cf. Davis v. Mansfield Metro. Hous. Auth.*, 751 F.2d 180, 185 n. 4 (6th Cir.1984) (holding that expulsion of public housing residents requires adequate notice, the right to counsel, the right to cross-examine witnesses, and a written decision by an impartial hearing panel based solely on evidence presented at the hearing); *Gorsuch Homes, Inc. v. Wooten*, 73 Ohio App.3d 426, 597 N.E.2d 554 (1992) (holding that, where termination of housing benefits depends upon resolution of disputed issues of fact, due process requires an opportunity to confront and to cross-examine adverse witnesses). *But cf. Perry v. Royal Arms Apartments*, 729

F.2d 1081 (6th Cir.1984) (holding that *Goldberg* protections for the termination of housing subsidies are not required where the eviction from public housing was already subject to due process protections under state law); *Simmons v. Drew*, 716 F.2d 1160 (7th Cir.1983) (same). Therefore, we have jurisdiction of this "contested case" under D.C.Code § 1–1502(8) (2001).[10]

## B. Review of Agency Decision

■■■ To uphold the decision of an administrative agency in a contested case under the Administrative Procedure Act, D.C.Code §§ 1–1501 *et. seq.* (1999 Repl.), "(1) the decision must state findings of fact on each material, contested factual issue; (2) those findings must be based on substantial evidence; and (3) the conclusions of law must follow rationally from the findings." *Perkins v. District of Columbia Dep't of Employment Servs.*, 482 A.2d 401, 402 (D.C.1984).

■■■ In the case before us, the reviewing agency failed to comply with the first of these three requirements, which prevents us from properly evaluating the other two. *See King v. District of Columbia Dep't of Employment Servs.*, 742 A.2d 460, 465 (D.C.1999) (explaining that this court requires a finding of fact on each material, contested issue in order to evaluate the sufficiency of the evidence and whether the agency's factual findings lead rationally to its conclusions of law). Pow-

10. We do not hold that a trial-type hearing is constitutionally mandated for all terminations of TAP benefits. The fact that termination in this case results in permanent ineligibility creates a strong interest on the part of the participant in due process, and the complexity of a fraud determination may require greater due process protections than simpler inquiries. We leave open the question of what due process protections might be constitutionally re-

quired in less complex matters, or cases involving lesser property interests. We also leave open all questions as to the timing of any due process protections, including, in the case before us, whether due process requires a trial-type hearing before an initial suspension of TAP payments. *See Richard Milburn Pub. Charter Alternative High Sch. v. Cafritz*, 798 A.2d 531, 540 n. 11 (D.C.2002).

ell is accused of "[f]raudulently underreport[ing] income ... for the purposes of paying a lower tenant rent and obtaining greater assistance." 14 DCMR § 1936.1(c).[11] This allegation requires proof of the five elements of common law fraud: "(1) a false representation, (2) in reference to material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action taken in reliance upon the representation." *D'Ambrosio v. Colonnade Council of Unit Owners*, 717 A.2d 356, 361 (D.C.1998). DCHA was required to "articulate the evidence with respect to each element of fraud, make a finding as to each, and state a conclusion as to the fraud alleged." *Jacobs*, 382 A.2d at 286. Nowhere in the DCHA decision is there a reference to the applicable regulation mandating permanent termination of benefits for fraud, *see* 14 DCMR § 1932.3(c) (1991). Indeed the word "fraud" does not appear in the decision, nor is there an articulation of the elements of fraud. Instead, DCHA provides a summary of the evidence presented by each party,[12] with no explicit assessment of the credibility of the evidence presented, nor an evaluation of the facts against a definition of fraud.

▮▮▮▮ To find that a misstatement was made with knowledge of its falsity, the person accused, and not "a hypothetical reasonable person," must be found to have known that the statement was false, or to have made that statement with reckless

11. 14 DCMR § 1936.1 provides in full:

> DPAH shall terminate the assistance of any tenant it discovers to have done the following:
> (a) Fraudulently misrepresented or fraudulently documented eligibility for assistance;
> (b) Fraudulently documented family circumstances for the purpose of obtaining a selection preference on the waiting list;
> (c) Fraudulently unerreported income or assets, or overstated allowances or family size for the purposes of paying a lower tenant rent and obtaining greater assistance; or
> (d) Received duplicative assistance under this program and any other federal or District housing program.

12. "TAP's Summary of Facts" was documented as follows:

> Each year during the annual re-certification process[,] Ms. Powell indicated on the TAP annual application that she received or expected to receive child support[.] [H]owever[,] on the next page of the same application information document, she failed to indicate the fact that she was already receiving monthly child support payments. This practice took place for several years, until 1995[,] when she was told by DHS to report the child support along with the reduce[d] P.A. payments. She stated for the record[ ] [that] she was told that her monthly rent portion from TAP could be reduced, consequently she chose to indicate the support money as income, after all of this time. Further, since 1988[,] Ms. Powell was responsible for filling out and signing the Family Responsibility Statement[,] which clearly states under the Conditions Clause "increases in family income of more than fifty dollars ($50) per month" is to be reported annually and during interim reexaminations. Ms. Powell was in violation of the regulations by withholding information on additional family income for over 5 years.

The "Tenant's Summary of Facts" was documented by the agency as follows:

> Based on the taped review session[,] the client indicated that she was told by TAP and DHS that child support payments were not considered income! However[,] in 1995[,] when she fill[ed] out the annual TAP information application[,] she wrote in the child support information and monthly amount. She was told by DHS[ ] [that] TAP could reduce her monthly payment by her reporting the child support payments and reduction in welfare payments. She stated she had beg[u]n to receive a lower amount of her welfare check because of the child support payments, in addition to being penalized for not reporting the monthly child support payments, which she had been receiving since about 1988.

indifference as to its truth. *Jacobs*, 382 A.2d at 287.[13] The only allusion to knowledge in the summary of TAP evidence is the observation that Powell signed a statement "which clearly states [that] ... increases in family income of more than fifty dollars ($50) per month [are] to be reported annually and during interim reexaminations." Powell's signature—an objective indication of assent—is insufficient, without more, to show her subjective understanding of the information requested by the TAP forms or her state of mind in responding to TAP inquiries,[14] particularly when one considers that Powell always listed an entitlement to receive child support and, in 1994, added that she expected to receive such payments. *See Bennett v. Kiggins*, 377 A.2d 57, 59 (D.C.1977) (holding that, under the clear and convincing standard, fraud must be shown by evidence "which is not equally consistent with either honesty or deceit").[15] Even more troubling is the fact that the one finding of fact that is clear from the reviewer's decision—that "Powell decided to use the child support payments in 1995 as a means of having to p[ay] less rent through the TAP program...."—does not follow from any of the evidence presented. Powell made no misstatements in 1995; on the contrary, that was the year that she voluntarily informed TAP officials of the child support payments she received. The fact that she truthfully disclosed receiving child support payments in 1995, even assuming that she

did so, as the government contends, on the false assumption that the admission would result in an increase in her TAP subsidy to offset a decrease in AFDC payments, is not a misstatement and therefore cannot, as a matter of law, itself constitute fraud. Even if considered as evidence of what Powell's intent may have been during the prior years when she did not list the child support payment as income, it does not rise to the level of clear and convincing evidence.

For all of the foregoing reasons, the decision of DCHA terminating Powell's eligibility for TAP is reversed, and the case is remanded for further proceedings in conformity with this decision.

*So ordered.*

---

**13.** We note, however, that ironic commentary on Powell's evidence, such as the insertion of an exclamation point after the phrase, "[Powell] was told by TAP and DHS that child support payments were not considered income (!)" is no substitute for explicit determinations of credibility.

**14.** In addition, Powell testified that she was misinformed that child support payments did not need to be reported as income. See *supra* note 13.

**15.** In *Branch*, we suggested that DCHA "specify the evidentiary standard used in making its decision, i.e., whether it used the normal standard of preponderance of the evidence or, since fraud is involved, the higher standard of clear and convincing." 661 A.2d at 1105 n. 7. Although DCHA has not specified the applicable evidentiary standard, the parties concur that the clear and convincing standard is appropriate. We therefore assume this to be the correct evidentiary standard, without deciding the matter.